**SEALED**

FILED
November 15, 2023
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
By: _____MR_____
                      Deputy

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

Case No: SA:23-CR-00599-JKP

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAMES MICHAEL BERGERON,<br><br>Defendant. | **INDICTMENT**<br><br>COUNTS 1-5: 18 U.S.C. § 1343<br>Wire Fraud<br><br>COUNT 6: 18 U.S.C. § 1014<br>False Statement<br><br>COUNTS 7-9: 18 U.S.C. § 1957<br>Engaging in a Monetary Transaction over $10,000 Using Criminally Derived Proceeds<br><br>COUNTS 10-11: 18 U.S.C. § 1956(a)(1)(B)(i)<br>Concealment Money Laundering |

THE GRAND JURY CHARGES:

### INTRODUCTION

At all times relevant to this Indictment:

1.  Defendant James Michael BERGERON was a resident of San Antonio, Texas, in the Western District of Texas. He owned and controlled several businesses, including OTOMOB Investments, Inc. ("OTOMOB"), American Light, LLC ("American Light"), AZ Plate Restaurant Group, LLC ("AZ Plate"), Pizza by Scarpas, LLC ("Scarpas"), and NM Plate Restaurant Group, LLC ("NM Plate").

1

*The Small Business Administration*

2. The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

*The Paycheck Protection Program*

3. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 that was designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

4. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the applicant (through its authorized representative) was required to state, among other things: (a) its average monthly payroll expenses; and (b) its number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, the applicant was required to provide documentation showing its payroll expenses.

5.    A business's PPP loan application was received and processed, in the first instance, by a participating lender.  If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies.  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

6.    PPP loan proceeds were required to be used by the business on certain permissible expenses: payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time after receiving the proceeds and used a certain amount of the PPP loan proceeds on payroll expenses.

**The Restaurant Revitalization Fund**

7.    The American Rescue Plan Act of 2021 ("ARP") was a federal law enacted in or around March 2021 that was designed to provide emergency financial assistance to the millions of Americans who were still suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the ARP was the authorization of up to $28.6 billion in forgivable grants to restaurants and other eligible businesses for payroll and certain other expenses, through a program referred to as the Restaurant Revitalization Fund ("RRF").  The purpose of the RRF was to support the restaurant industry by providing funding to those that had suffered significant pandemic-related revenue loss.  The RRF also includes specific requirements to ensure equitable distribution to small business concerns owned by women, veterans, and socially and economically disadvantaged applicants.

8.    Under the RRF, the SBA provided funding of up to $5,000,000 per location (not to exceed $10,000,000 total for the applicant and any affiliated businesses) for applicants who met

certain conditions. The amount of an applicant's RRF award was calculated as the applicants 2019 gross receipts, minus the applicant's 2020 gross receipts, minus PPP loan amounts.

9. RRF awardees were not required to repay funds received under the RRF unless the funds were used for unauthorized purposes, if the funds were not used by March 11, 2023, or if applicable, the awardee permanently closed before using all funds on authorized purposes. Authorized purposes included payroll costs, payments on any business mortgage, business rent payments, business debt service, business utility payments, business maintenance expenses, construction of outdoor seating, business supplies, business food and beverage expenses, covered supplier costs, and business operating expenses.

10. To obtain an RRF loan, a qualifying business had to submit an RRF loan application, signed by an authorized representative of the business. The RRF loan application required the business (through its authorized representative) to make certain affirmative certifications to be eligible to obtain the RRF loan. In the RRF loan application, the business (through its authorized representative) had to state, among other things, (a) its 2019 gross receipts as reported on its 2019 federal tax return; (b) its 2020 gross receipts as reported on its 2020 Federal tax return; (c) that the business has not permanently closed; and (d) that current economic uncertainty made the funding request necessary to support the ongoing or anticipated operations of the applicant.

11. The RRF loan proceeds were administered directly by the SBA to the RRF applicant.

***Relevant Entities***

12. The following entities participated in the PPP as lenders, and as such were eligible to lend funds to eligible borrowers under the terms of the PPP:

   a. Bank 1 was a federally insured financial institution headquartered in New Jersey and New York.

   b. Financial Institution 1 was a financial institution headquartered in Colorado.

   c. Financial Institution 2 was a financial institution headquartered in New York.

   d. Financial Institution 3 was a financial institution headquartered in New Jersey.

13. Bank 2 was a federally insured financial institution headquartered in California.

14. Bank 3 was a federally insured financial institution headquartered in Utah.

15. Bank 4 was a federally insured financial institution headquartered in North Carolina.

**COUNTS ONE THROUGH FOUR**
[18 U.S.C. § 1343]

16. Paragraphs 1 through 15 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

***The Scheme to Defraud***

17. Beginning in or around June 2020, and continuing until at least in or around November 2022, in the Western District of Texas, and elsewhere, Defendant,

**JAMES MICHAEL BERGERON**,

did knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signals, pictures, and sounds, for the purpose of executing such scheme and artifice.

*Purpose of the Scheme and Artifice*

18. It was the purpose of the scheme and artifice to defraud for BERGERON to unlawfully enrich himself by, among other things: (a) submitting and causing the submission of false and fraudulent PPP loan applications to banks and financial institutions; (b) falsely promising to use the loan proceeds on permitted business expenses under the PPP; (c) concealing and causing the concealment of the scheme; and (d) diverting fraud proceeds for the personal use and benefit of himself and others.

*The Manner and Means of the Scheme*

19. It was part of the scheme that Defendant BERGERON submitted and caused to be submitted fraudulent PPP loan applications to banks and financial institutions for the purpose of obtaining funds from them.

20. In connection with applications for PPP loans and to further the scheme, Defendant BERGERON submitted and caused to be submitted materially false and fraudulent information to banks and financial institutions, including falsely and fraudulently representing to banks and financial institutions: (i) the applicant entities' number of employees; (ii) the applicant entities' average monthly payroll; (iii) the supporting documentation submitted with the application; and, (iv) the truth and accuracy of all the information and documents submitted in or with the applications. Specifically, among others:

    a. On or about July 14, 2020, BERGERON submitted and caused to be submitted to Financial Institution 1 a PPP application in the name of OTOMOB, falsely representing that it had an average monthly payroll of $57,955.30 and 19 employees and including false supporting tax documentation for the applicant entity.

   b. On or about July 16, 2020, BERGERON submitted and caused to be submitted to Bank 1 a PPP application in the name of American Light, falsely representing that it had an average monthly payroll of $248,467 and 54 employees and including false supporting tax documentation for the applicant entity and a false Certificate of Formation from the Texas Secretary of State.

   c. On or about February 2, 2021, BERGERON submitted or caused to be submitted to Financial Institution 2 a PPP application in the name of Scarpas, falsely representing that it had an average monthly payroll of $53,950 and 10 employees and including false supporting tax documentation for the applicant entity.

   d. On or about February 16, 2021, BERGERON submitted and caused to be submitted to Financial Institution 3 a PPP application in the name of AZ Plate, falsely representing that it had an average monthly payroll of $592,028 and 111 employees and including false supporting tax documentation for the applicant entity.

   e. On or about February 22, 2021, BERGERON submitted and caused to be submitted to Financial Institution 1 a PPP application in the name of OTOMOB, falsely representing that it had an average monthly payroll of $57,955.30 and 19 employees and including false supporting tax documentation for the applicant entity.

  21. It was further part of the scheme that Defendant BERGERON falsely represented that the funds would be used for legitimate business expenses. In fact, the PPP loan funds were used for, among other things, personal expenses and other non-business expenses.

  22. It was further part of the scheme that defendant BERGERON concealed and caused to be concealed the fraudulent nature of the PPP applications and the impermissible use of the PPP funds.

*Use of the Wires*

23. On or about the dates listed below, in the Western District of Texas, and elsewhere, Defendant,

**JAMES MICHAEL BERGERON,**

did knowingly devise and intend to devise a scheme or artifice to defraud and to obtain money and property by means of material false and fraudulent presentences, representations and promises, which scheme affected the financial institutions described below, and, for the purpose of executing such scheme or artifice, did transmit and did cause to be transmitted, by wire and radio communications in interstate and foreign commerce, writings, signs, pictures, signals, and sounds, as described below.

| Count | Approx. Date | Description of Interstate Wire |
|---|---|---|
| 1 | 7/14/2020 | Transmission of PPP application on behalf of OTOMOB from Texas to Illinois |
| 2 | 7/16/2020 | Transmission of PPP application on behalf of American Light from Texas to Illinois |
| 3 | 2/16/2021 | Transmission of PPP application on behalf of AZ Plate from Texas to Illinois |
| 4 | 2/22/2021 | Transmission of PPP application in the name of OTOMOB from Texas to Illinois |

All in violation of Title 18, United States Code, Section 1343.

## COUNT FIVE
[18 U.S.C. § 1343]

24. Paragraphs 1 through 15 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

*The Scheme to Defraud*

25. In or around May 2021 in the Western District of Texas, and elsewhere, Defendant

**JAMES MICHAEL BERGERON,**

8

did knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signals, pictures, and sounds, for the purpose of executing such scheme and artifice.

*Purpose of the Scheme and Artifice*

26. It was the purpose of the scheme and artifice to defraud for BERGERON to unlawfully enrich himself by, among other things: (a) submitting and causing the submission of a false and fraudulent RRF loan application to the SBA; (b) falsely promising to use the loan proceeds on permitted business expenses under the RRF; (c) concealing and causing the concealment of the scheme; and (d) diverting fraud proceeds for the personal use and benefit of himself and others.

*The Manner and Means of the Scheme*

27. It was part of the scheme that Defendant BERGERON submitted and caused to be submitted a fraudulent RRF loan application to the SBA for the purpose of obtaining RRF funds.

28. In connection with the application for RRF funds and to further the scheme, Defendant BERGERON submitted and caused to be submitted materially false and fraudulent information to the SBA, including falsely and fraudulently representing to the SBA the applicant entity's gross receipts. Specifically, on or about May 3, 2021, BERGERON submitted and caused to be submitted to the SBA an RRF application in the name of NM Plate, falsely representing that it had gross receipts in 2019 of $4,655,776 and gross receipts in 2020 of $1,193,278.

9

29. It was further part of the scheme that Defendant BERGERON falsely represented the intended use of the funds, claiming that the funds would be used for legitimate business expenses. In fact, the RRF loan funds were used for, among other things, personal expenses and other non-business expenses.

30. It was further part of the scheme that Defendant BERGERON concealed and caused to be concealed the fraudulent nature of the RRF application and the impermissible use of the RRF funds.

*Use of the Wires*

31. On or about May 3, 2021, in the Western District of Texas, and elsewhere, Defendant,

**JAMES MICHAEL BERGERON,**

did knowingly devise and intend to devise a scheme or artifice to defraud the SBA and to obtain money and property by means of material false and fraudulent presentences, representations and promises, and, for the purpose of executing such scheme or artifice, did transmit and did cause to be transmitted, by wire and radio communications in interstate and foreign commerce, writings, signs, pictures, signals, and sounds, an RRF application on behalf of NM Plate from Texas to Illinois, all in violation of Title 18, United States Code, Section 1343.

### COUNT SIX
[18 U.S.C. § 1014]

32. Paragraphs 1 through 23 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

33. On or about July 16, 2020, in the Western District of Texas and elsewhere, Defendant,

**JAMES MICHAEL BERGERON**

did knowingly make a false statement for the purpose of influencing the actions of Bank 1, the accounts of which are insured by the Federal Deposit Insurance Corporation, in connection with an application or loan, to wit, by falsely representing American Light's total number of employees and average monthly payroll when BERGERON then knew American Light did not have the number employees or the amount of payroll represented, all in violation of Title 18, United States Code, Section 1014.

## COUNTS SEVEN THROUGH NINE
[18 U.S.C. § 1957]

34.   Paragraphs 1 through 23 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

35.   On or about the dates set forth below, in the Western District of Texas and elsewhere, Defendant,

## JAMES MICHAEL BERGERON

did knowingly engage and attempt to engage in a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000 by, through, or to a financial institution, to wit, by transferring funds and by making payments as described below, such property having been derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343.

| Count | Approx. Date | Financial Transaction |
|---|---|---|
| 7 | July 27, 2020 | ACH transfer of approx. $40,002 from American Light's bank account at Bank 3 to Alliant CU for the payment of BERGERON's mortgage for the property located in the 24000 block of Vecchio in San Antonio. |
| 8 | July 28, 2020 | Check for approx. $90,417.03 from OTOMOB's bank account at Bank 2 to North Park Lincoln for the purchase of a 2020 Lincoln Navigator |

11

| 9 | September 2, 2022 | Check for approx. $30,000 from BERGERON's bank account at Bank 4 to Genesis Northwest of San Antonio for the purchase of a 2023 Genesis GV80 |

36. All in violation of Title 18, United States Code, Section 1957.

## COUNTS TEN THROUGH ELEVEN
### [18 U.S.C. § 1956(a)(1)(B)(i)]

37. Paragraphs 1 through 15 and 24 through 31 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

38. On or about the dates set forth below, in the Western District of Texas and elsewhere, Defendant,

**JAMES MICHAEL BERGERON,**

knowing that the property involved in the financial transactions listed below represented the proceeds of some form of unlawful activity, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343, did knowingly and willfully conduct and cause to be conducted the financial transactions which were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the unlawful activity, and said transactions involved a financial institution engaged in activities affecting interstate commerce.

| Count | Approx. Date | Financial Transaction |
|---|---|---|
| 10 | July 8, 2021 | Approx. $8,333.34 in NM Plate RRF funds transferred from the American Light account at Bank 3 to an account actually controlled by BERGERON. |
| 11 | August 9, 2021 | Approx. $7,996.15 in NM Plate RRF funds transferred from the American Light account at Bank 3 to an account actually controlled by BERGERON. |

All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## NOTICE OF UNITED STATES OF AMERICA'S DEMAND FOR FORFEITURE
[*See* Fed. R. Crim. P. 32.2]

This Notice of Demand for Forfeiture includes but is not limited to the property described below.

### I.
### Wire Fraud Violations and Forfeiture Statutes
**[Title 18 U.S.C. § 1343; subject to forfeiture pursuant to
Title 18 U.S.C. § 981(a)(2)(A)]**

As a result of the foregoing criminal violations set forth in Counts One through Five, the United States of America gives notice to the Defendant of its intent to seek the forfeiture of property upon conviction and pursuant to Fed. R. Crim. P. 32.2 and Title 18 U.S.C. § 981(a)(2)(A), which states:

> **Title 18 U.S.C. § 982.  Criminal forfeiture**
> **(a)(2)** The court, in imposing sentence on a person convicted of a violation of, or conspiracy to violate-
> (A) section . . . 1343 . . . of this title, affecting a financial institution, or
> \*\*\*
> shall order that the person forfeit to the United States any property constituting, or derived from proceeds the person obtained directly or indirectly, as a result of such violation.

### II.
### False Statements Violations and Forfeiture Statutes
**[Title 18 U.S.C. § 1014; subject to forfeiture
pursuant to Title 18 U.S.C. § 982(a)(2)]**

As a result of the foregoing criminal violation set forth in Count Six, the United States of America gives notice to the Defendant of its intent to seek the forfeiture of property upon conviction pursuant to Fed. R. Crim. P. 32.2 and Title 18 U.S.C. § 982(a)(2), which states:

> **Title 18 U.S.C. § 982.  Criminal forfeiture**
> **(a)(2)** The court, in imposing sentence on a person convicted of a violation of, or conspiracy to violate-
> (A) section . . . 1014 . . . of this title, affecting a financial institution, or
> \*\*\*

shall order that the person forfeit to the United States any property constituting, or derived from proceeds the person obtained directly or indirectly, as a result of such violation.

### III.
### Money Laundering Violations and Forfeiture Statutes
### [Title 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957; subject to forfeiture pursuant to Title 18 U.S.C. § 982(a)(1)]

As a result of the foregoing criminal violations set forth in Counts Seven through Eleven, the United States of America gives notice to the Defendant of its intent to seek the forfeiture of property upon conviction pursuant to Fed. R. Crim. P. 32.2 and Title 18 U.S.C. § 982(a)(1), which states:

> **Title 18 U.S.C. § 982. Criminal forfeiture**
> **(a)(1)** The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957 . . . shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

### IV.
### Property

Real Property Located At **24227 Vecchio, San Antonio, TX 78260, Bexar County, Texas,** with all buildings, appurtenances, and improvements, thereon and any and all surface and sub-surface rights and interests, if any, and being more fully described as:

LOT 30, BLOCK 25, NEW CITY BLOCK 19216, HEIGHTS AT S.O. PUD POD A, UNIT 2, PHASE 2, AN ADDITON TO THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED IN, VOLUME 9595, PAGE 119, DEED AND PLAT RECORDS OF BEXAR COUNTY, TEXAS.

### V.
### Accounts

1. Funds up to $134,703.61 in The Bancorp Bank account number: xx7609 (aka BlueVine account number: xxxxxxxx1994), held in the name of Pizza by Scarpas, LLC. (signatory is James Bergeron);
2. Funds up to $6,966.04 in Lending Club Bank account number: xxxxxx3282, held in the name of Pizza by Scarpas, LLC. (signatory is James Bergeron);
3. Funds up to $4,950.00 in LendingClub Bank account number: xxxxxx8821, held in the

      name of Plate Restaurant Group (signatory is James Bergeron);
4. Funds up to $22,716.12 in PNC Bank account number: xxxxxx5353 (aka BBVA account number: xxxxxx4409), held in the name of OTOMOB Investments Inc. (signatory is James Bergeron);
5. Funds up to $20,679.51 in Amegy Bank account number: xxxxxx4245, held in the name of OTOMOB Investments Inc. (signatory is James Bergeron);
6. Funds up to, $100,387.19 in Ally Bank account number: xxxxxx6236, held in the name of James M. Bergeron, Jr.;
7. Funds up to $1,068,718.81 in Social Finance, Inc. (SoFi) account number: xxxxxxxx3243, held in the name of James Bergeron;
8. Funds up to $98,467.08 in Bank of America account number: xxxxxxxx5166, held in the names of James Bergeron and Christen Bergeron;
9. Funds up to $38,105.55 in JPMorgan Chase Bank account number: xxxxx3710, held in the name of OTOMOB Investments Inc. (signatory is James Bergeron); and
10. Funds up to $963,554.61 in Wells Fargo Bank account number: xxxxxx4323, held in the names of James Bergeron and Christen Bergeron;

## VI.
## Vehicles

1. 2020 Lincoln Navigator; VIN: 5LMJJ3KT0LEL06643; and
2. 2023 Genesis GV80; VIN: KMUHCESC2PU114757.

## VII.
## Money Judgment

**Money Judgment**: a sum of money which represents value of the property involved in and the amount of proceeds the Defendant obtained directly or indirectly as a result of the violations set forth above for which the Defendant is liable.

## VIII.
## Substitute Property

If any property subject to forfeiture for the violations set forth above, as a result of any

act or omission of the Defendant:

    a. cannot be located upon the exercise of due diligence;
    b. has been transferred or sold to, or deposited with, a third party;
    c. has been placed beyond the jurisdiction of the court;
    d. has been substantially diminished in value; or
    e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America to seek forfeiture of any other property, up to the

15

value of said money judgment, as substitute property pursuant to Title 21 U.S.C. § 853(p) and Fed. R. Crim. P. 32.2(e)(1).

A TRUE BILL

███████████████

FOREPERSON OF THE GRAND JURY

JAMES ESPARZA
UNITED STATES ATTORNEY

BY: *[signature]*
FOR: JUSTIN R. SIMMONS
ASSISTANT UNITED STATES ATTORNEY

GLENN S. LEON, CHIEF
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

BY: *[signature]*
FOR: ARIEL GLASNER
    TRIAL ATTORNEY
    FRAUD SECTION, CRIMINAL DIVISION
    U.S. DEPARTMENT OF JUSTICE

16